UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAUL ALLEN ADAMS,

                Plaintiff,

v.                                                               Case No. 17-cv-0699-bhl

RANDALL R. HEPP, et al.,

                Defendants.

## DECISION AND ORDER

      Paul Allen Adams filed this lawsuit under 42 U.S.C. §1983, suing nine defendants he alleges were deliberately indifferent to his serious medical needs. (ECF No. 48 at 8-9.) On June 7, 2019, defendants filed a motion for summary judgment, which is now fully briefed. For the reasons explained in this order, the Court will grant defendants' motion as to seven of the defendants — Randal Hepp, Regina De Trana-Hinrichs, Dawn Proehl, Candace Whitman, Jeff DeVries, Rebecca Trewyn, and Samantha Floeter — but will deny the motion as to the remaining two defendants — Robert Frank and Charles Larson.

## SUMMARY JUDGMENT STANDARD

      "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

      The party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

1

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## EXHAUSTION OF AVAILABLE ADMINISTRATIVE REMEDIES

Before turning to the merits of Adams' claims, the Court will address defendants' argument that Adams did not exhaust the available administrative remedies with regard to two of his claims. Adams sued DeVries for failing to provide a private area to self-administer an enema, and he sued Floeter for failing to timely schedule his surgery. Under the Prison Litigation Reform Act (PLRA), which applies to this case because Adams was incarcerated when he filed his complaint, a prisoner must exhaust available administrative remedies before he can sue a prison official under federal law. 42 U.S.C. §1997e(a). Accordingly, Adams cannot pursue his deliberate-indifference claims against DeVries or Floeter if, as they argue, he did not first exhaust the available administrative remedies.

To properly exhaust administrative remedies, prisoners must file their inmate complaints and appeals in the place, at the time, and in the manner that the institution's administrative rules require. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). The Supreme Court has advised that a prisoner's efforts to exhaust are "not *per se* inadequate simply because an individual later sued was not named in the grievance." *Jones v. Bock*, 549 U.S. 199, 219 (2007). But it is well settled that an inmate's grievance must "alert[] the prison to the nature of the wrong for which redress is sought." *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002); *see also* Wis. Admin. Code §DOC 310.09(1)(e)[1] (a complaint "shall clearly identify the issue").

---

[1] References to the Wis. Admin. Code DOC 310 are to the December 2014 version, which was in effect at the relevant time.

With regard to DeVries, Adams does not dispute that he did not file any grievances about DeVries not providing him with a private area to self-administer an enema. (ECF No. 93 at ¶154; ECF No. 129 at ¶154.) His failure to do so is fatal to his claim against DeVries, who is entitled to summary judgment.

With regard to his claim against Floeter, Adams points out that he filed a grievance about the "un[necess]ary infliction of pain and suffering and a failure to treat easily reco[g]nizable sta[]ge 3 hemor[rho]ids." (ECF No. 98-2 at 8.) Even assuming this could be construed to encompass a claim about delayed scheduling, that grievance was rejected as untimely because Adams filed it "well beyond the 14-day time limit to file a complaint with respect to hemorrhoid surgery on 9/20/16." (*Id.* at 98-2.) Thus, Adams' claim against Floeter must be dismissed because he failed to file his grievance "in the place, and at the time, the prison's administrative rules require." *Palmore v. Litscher*, 47 F. App'x 777, 778 (7th Cir. 2002).

Adams tries to save his claim against Floeter by pointing to a second grievance he filed on November 10, 2016, in which he claims he complained about the scheduling delay and which he insists was addressed on the merits. (ECF No. 130 at 1; ECF No. 133 at 16.) But Adams mischaracterizes both the grievance itself and the examiner's handling of the grievance.

When prompted by the grievance form to "Briefly state who or what is the <u>one</u> issue of this complaint," Adams wrote, "Refusal of HSU, Warde[n], PRC, PSCY [sic], Madison dietitian, Greg Phal, to properly treat my c[h]ronic IBS per-DAI/DOC Policy, and provide me with the right diet/foods." (ECF No. 133 at 16.) When prompted by the grievance form to provide the details surrounding the complaint, Adams wrote a two-page, single-spaced narrative that included numerous details that are irrelevant to the issue he identified. (*Id.* at 16-17.) Tucked in this narrative is the sentence, "I then was made to wait[] until Sept 20, 2016 to have the surgery because the person in charge of scheduling with the hospital forgot to do it." (*Id.* at 17.) Adams argues that, in light of this sentence, the Court should find that he exhausted the available administrative remedies on the scheduling issue because he raised this issue in his grievance. The Court disagrees. The inmate complaint examiner summarized Adams' grievance as follows: "Inmate complains HSU is refusing to properly treat his IBS and provide him with the right diet which is no soy." (ECF No. 133 at 23.) The reviewing authority denied the grievance,

3

explaining, "Wants a No Soy diet which is not done in DOC. The physician and dietician are working with the patient to assist in combatting the effects of the IBS." (*Id.* at 22.)

Contrary to Adams' characterization, the examiner nowhere addresses the substance of a claim about a scheduling delay. In fact, when Adams appealed the decision, *he* did not even mention the scheduling delay. (ECF No. 133 at 19- 20.) His appeal focused only on the issue he explicitly identified in his grievance and the issue addressed by the inmate complaint examiner and reviewing authority: the failure of various individuals to provide him with "the right diet" for his chronic conditions. (*Id.* at 15, 19-20, 22-23.) Because Adams did not exhaust the available administrative remedies on this claim, Floeter is entitled to summary judgment.

## FACTUAL BACKGROUND[2]

### A. The Parties

Adams was housed at Fox Lake Correctional Institution from August 28, 2014, until May 10, 2018. (ECF No. 93 at ¶1.) He was released from prison in February of this year. (ECF No. 141.) Defendants all interacted with Adams while he was housed at Fox Lake. During the relevant time period, defendants Dr. Charles Larson was a physician, Robert Frank was an Advanced Practice Nurse Prescriber (APNP), Rebecca Trewyn was a nurse practitioner (NP), Dawn Proehl was a nurse clinician, Candace Whitman was the health services manager, Randall Hepp was the warden, and Regina De Trana-Hinrichs was a registered dietician. (ECF No. 93 at ¶¶2-10.)

### B. Adams' Medical Conditions

When Adams arrived at Fox Lake, he had already been diagnosed with chronic hepatitis C virus (HCV) and cirrhosis of the liver. (ECF No. 93 at ¶17.) Defendants explain that cirrhosis causes "portal hypertension and puts increased pressure on the veins in the stomach and the

---

[2] Adams has a complicated medical history with extensive interactions with health services. He did not help simplify this history when he ignored the requirements of Civil L. R. 56(b)(2)(B)(ii) and filed an argumentative and haphazardly supported set of proposed facts. (ECF No. 130.) He also attached nearly 1,400 pages of documents in support of his response, despite a Magistrate Judge's prior warning that, "the court will not sift through his documents to make his case for him." (ECF No. 123 at 5.) The Court will consider Adams' "assertions only to the extent they are clearly and obviously supported by citations to the [] record." *Jenkins v. Syed*, 781 F. App'x 543, 545 (7th Cir. 2019). This background section summarizes the material facts.

4

intestines (varices), which can rupture and result in life-threatening gastrointestinal bleeding." (*Id.* at ¶20.) Further, because blood flow through the hardened liver is impeded, blood vessels in the GI tract and intestines develop higher pressure. (*Id.* at ¶21.) This increased pressure often results in the development of varicose veins (or varices) in areas such as the esophagus, stomach, and sometimes the rectal area. (*Id.*)

Adams also has been treated for internal hemorrhoids. (ECF No. 93 at ¶84.) The difference between hemorrhoids and rectal varices is in what causes each condition. (*Id.* at ¶22.) "Hemorrhoids frequently occur from chronic constipation from the increased pressure in the blood vessels by bearing down to defecate." (*Id.*) They can also be caused by chronic diarrhea (from frequently straining to have a bowel movement or sitting for prolonged periods on the toilet). (*Id.* at ¶72.) Rectal varices occur due to increased blood pressure in the portal system which is the blood vessel system that feeds the liver and GI tract. (*Id.* at ¶22.) According to defendants, hemorrhoids can be confused for or associated with rectal varices. (*Id.* at ¶84.)

Hemorrhoids frequently resolve on their own or will resolve with conservative treatment, such as with anti-diarrheal medication and/or increased dietary fiber. (ECF No. 93 at ¶78.) Hemorrhoids generally do not require surgery unless conservative treatment has failed or unless they are thrombosed (that is, they contain a blood clot and are painful). (*Id.*) Even thrombosed hemorrhoids can heal on their own (the body reabsorbs the blood clot in time); however, surgery is sometimes done because of the pain and discomfort associated with thrombosed hemorrhoids. (*Id.*) Defendants assert that, because of Adams' chronic HCV and history of alcoholism, his hemorrhoids were more likely to recur than an average person's. (*Id.* at ¶123.)

According to defendants, Adams also had some problems with irritable bowel syndrome (IBS). (ECF No. 93 at ¶17.) Defendants explain that patients with HCV are more at risk for developing IBS and other gastrointestinal issues. (*Id.* at ¶19.) An improper diet can be a major contributor to uncomfortable symptoms associated with IBS. (*Id.* at ¶50.) According to defendants, patients with IBS should generally try to avoid spicy foods and eat more bland foods. (*Id.*) Also, while a high fiber diet is often recommended, it is not always recommended; each patient's diet is individualized depending on whether they are having more trouble with diarrhea, constipation or a combination of both. (*Id.*) Defendants explain that IBS is a condition in which

5

symptoms and treatments are very specific to individual patients; what works for some may exacerbate symptoms in others. (*Id.* at ¶122.)

### C. Adams' Treatment at Fox Lake

#### 1. Complaints about Rectal Pain and Bleeding

NP Trewyn saw Adams in September 2014 for his cirrhosis and HCV. (ECF No. 93 at ¶28.) She decided to refer Adams to his liver specialist and order labwork because he was not responding to HCV treatment. (*Id.*) Adams asserts that NP Trewyn "ang[rily] refused to do a rectal exam." (ECF No. 129 at ¶28.)

APNP Frank first saw Adams the next month, in response to Adams' complaints of joint pain and fatigue. (ECF No. 93 at ¶31.) He saw Adams again the following month, mainly for complaints of IBS. (*Id.* at ¶35.) Adams requested a low-soy, high-protein diet, but APNP Frank did not have the authority to change Adams' diet; his request had to be reviewed by a dietician. (*Id.* at ¶¶35, 38.) APNP Frank ordered fiber caps to help Adams manage his diarrhea and offered two different medications, which Adams refused. (ECF No. 93 at ¶¶36-37.)

About a month later, on December 1, 2014, Adams complained of hemorrhoids and diarrhea to a nurse (who is not a defendant). (ECF No. 93 at ¶39.) The nurse gave him anti-diarrheal medication and medicated pads to help reduce inflammation, itching, and pain in the rectal area. (*Id.*) A couple weeks later, he saw NP Trewyn, who was monitoring his HCV treatment. (ECF No. 129 at ¶40.) According to Adams, she told him she would have someone else examine him for his complaints of rectal bleeding. (*Id.*)

A few days later, Adams saw Nurse Proehl for complaints about diarrhea, hemorrhoids, and his diet. (ECF No. 93 at ¶¶42-43.) She spoke to Dr. Larson, who gave her a verbal order to give Adams ibuprofen and hydrocortisone suppositories. (*Id.* at ¶44.) Nurse Proehl did not conduct a rectal exam because it is out of the scope of her duties as a nurse. (*Id.* at ¶47.) She also did not have the authority to modify Adams' diet, so she scheduled him for an appointment with Dr. Larson to discuss his concerns. (*Id.* at ¶¶45-46.)

Dr. Larson saw Adams about a month later, on January 29, 2015, and prescribed Boost twice per day to help with Adams' diarrhea and provide nutritional support. (ECF No. 93 at ¶48.) He also changed Adams' pain medication from ibuprofen to acetaminophen because acetaminophen has less risk of causing bleeding in patients with gastric varices. (*Id.* at ¶49.)

6

Adams asked Dr. Larson to perform a rectal exam, but Dr. Larson refused and referred him to APNP Frank for his rectal complaints. (ECF No. 129 at ¶48.)

On June 8, 2015, Adams had a colonoscopy with a biopsy. (ECF No. 93 at ¶70.) Defendants highlight that the report does not mention hemorrhoids, although they do not explain if hemorrhoids would be noticed during the colonoscopy and/or mentioned in the report. (*Id.*) Adams asserts there is no mention of hemorrhoids because the doctor was not told to look for them. (ECF No. 129 at ¶70.)

A couple of months later, in August 2015, Adams complained to APNP Frank about rectal pain and bleeding during painful bowel movements. (ECF No. 93 at ¶71.) APNP Frank recalls this appointment as the first time Adams complained about rectal bleeding. (*Id.*) Adams asserts that he first notified APNP Frank of his rectal bleeding nearly a year earlier. (ECF No. 129 at ¶71.) APNP Frank does not explain why he did not perform a rectal exam at this appointment.

APNP Frank saw Adams again about four months later, on December 22, 2015. (ECF No. 93 at ¶74.) According to APNP Frank, Adams did not complain of IBS symptoms or hemorrhoids, so he did not perform a rectal exam. (*Id.*) Adams remembers this appointment differently. He asserts that APNP Frank told him that he needed to focus on his HCV treatment because that was the cause of his bleeding and rectal pain. (ECF No. 129 at ¶74.) According to Adams, APNP Frank told him, as he had on prior occasions, that once his HCV was cured, the other issues would go away. (*Id.*)

About a month and a half later, on February 9, 2016, APNP Frank again saw Adams for complaints of pain in his rectal area. (ECF No. 93 at ¶76.) APNP Frank performed a rectal exam, during which he noted a large, partially prolapsed hemorrhoid. (*Id.*) APNP Frank requested that Adams be scheduled for a surgical consultation at Waupun Memorial Hospital. (*Id.*)

On April 27, 2016, Adams had a surgical consult at Waupun Memorial Hospital. (ECF No. 93 at ¶82.) About five months later, Adams had a hemorrhoidectomy. (*Id.* at ¶83.) Adams reported during a follow-up appointment that his recovery was going well. (*Id.* at ¶87.)

In February 2017, APNP Frank had an appointment with Adams to recheck for hemorrhoids based on Adams' complaint that he had burning and pain during bowel movements.

7

(*Id.* at ¶111.) APNP Frank performed a rectal exam and noted a large external hemorrhoid. (*Id.*) Given Adams' history, he ordered an offsite appointment for Adams to see the doctor who performed Adams' hemorrhoidectomy. (*Id.*) Adams filed this case soon thereafter, on May 18, 2017. (ECF No. 1.)

### 2. Complaints about Diet

De Trana-Hinrichs, the Department of Correction's dietician, was first informed of Adams' medical issues, including IBS, Hepatitis C, and cirrhosis, on January 21, 2015. (ECF No. 93 at ¶55.) She met with Adams via telemed about a week later. (*Id.* at ¶56.) According to De Trana-Hinrichs, Adams had been receiving a variety of foods, was receiving an individualized high-calorie snack bag based on his preferences, had multiple individualized dietary orders, and had gained about twenty pounds over the previous year. (*Id.*) Adams was a very selective eater and detailed what he would and would not eat. (*Id.* at ¶¶58, 60.) De Trana-Hinrichs learned that Adams was also purchasing food at the canteen, which could trigger IBS symptoms. (*Id.*) Adams explains that he would trade food with other inmates and use food as payment for legal work. (ECF No. 129 at ¶59.)

After the consultation, De Trana-Hinrichs ordered Adams a high-calorie meal plan, including a high-calorie snack bag plus Boost two times per day. (ECF No. 93 at ¶61.) De Trana-Hinrichs also documented Adams' requests for specific foods such as fresh fruit (no canned fruit), chicken patties, and hamburger patties, and his requests to avoid foods such as jelly, lunchmeat, and bread. (*Id.*) Adams asserts that the kitchen did not follow De Trana-Hinrichs' order and often gave him rotten fruit and vegetables. (ECF No. 129 at ¶61.)

Adams continued to complain about his diet, so on March 4, 2015, the Social Services Director (who is not a defendant), the Food Services Administrator (who is not a defendant), APNP Frank, the health services manager (who is not a defendant), Floeter, and Dr. Larson met with Adams at a patient care conference. (ECF No. 93 at ¶63.) De Trana-Hinrichs was not included. (*Id.* at ¶66.) Adams was given a Halal diet, which offered extra meat and fish. (ECF No. 93 at ¶64.) His order for Boost was also increased to three times per day, and a colonoscopy with biopsies was ordered to check for IBS. (*Id.*) Adams asserts that offering the Halal diet "was a dirty rotten trick" because, despite him showing them a diet order from March 2014 that

8

said "No Soy – If Possible per MD," the Halal diet contained nothing but soy products. (ECF No. 129 at ¶64 (citing ECF No. 97-1 at 17)).

Adams sent De Trana-Hinrichs a letter shortly after the care conference. (ECF No. 93 at ¶66.) De Trana-Hinrichs responded and told him to inform health services if he wanted the "low fiber/low residue meal plan"; she did not learn if Adams selected this plan. (*Id.* at ¶67.) Adams continued to complain that his diet needs were not being met. (*Id. at* ¶68.) Adams' providers contacted De Trana-Hinrichs and a high-protein diet with a high-protein snack bag was ordered. (*Id.* at ¶68.)

On April 27, 2016, Adams had an appointment with De Trana-Hinrichs at APNP Frank's request. (ECF No. 93 at ¶79.) In response to Adams' complaints, De Trana-Hinrichs ordered bananas and Healthy Shots, a nutritional supplement to provide additional calories and protein when Adams chose not to eat the meat provided with a meal. (*Id.* at ¶¶80-81.) Adams explains that he rarely received bananas because kitchen staff were angry about the constant diet changes De Trana-Hinrichs and APNP Frank were making. (ECF No. 129 at ¶81.)

De Trana-Hinrichs met with Adams again on November 21, 2016, to discuss his meal plan. (ECF No. 93 at ¶90.) Adams was concerned about not getting enough protein. (*Id.* at ¶91.) At the time, Adams was receiving about 163 grams of protein daily, which was 63 grams *more* than the general population was receiving. (*Id.*) According to De Trana-Hinrichs, Adams' labs indicated his protein status was within normal limits and he had not lost any weight. (*Id.*) Still, per his request, De Trana-Hinrichs ordered a calcium-fortified, sugar-free drink mix in place of milk. (*Id.*)

A couple of weeks later, on December 8, 2016, De Trana-Hinrichs had a telemed conference with Adams, the Food Service Administrator, and APNP Frank in response to a letter Adams had sent regarding his dietary needs. (ECF No. 93 at ¶98.) According to De Trana-Hinrichs, Adams was receiving more than an adequate amount of protein, and he reported eating all of his fruits, vegetables, chicken and fish patties and that breakfast was his best meal. (*Id.*) De Trana-Hinrichs explains that Adams still reported self-selecting and that he could not tolerate certain food items, so he continued to receive the nutritional supplement to make up for those times he was unable to eat certain foods. (*Id.* at ¶99.)

9

De Trana-Hinrichs explains that Adams was given two meal plan options: high protein or low soy. (ECF No. 93 at ¶100.) She asserts that either was suitable for his needs from a nutritional standpoint. (*Id.*) According to De Trana-Hinrichs, Adams' weight was greater than ideal and his liver function labs were within normal limits. (ECF No. 93 at ¶100.) She says Adams chose the high-protein diet, although he refused it the very next day. (*Id.* at ¶102.) Adams disputes De Trana-Hinrichs' characterization. He explains that the high-protein diet was forced on him, and he never would have refused a low-soy diet given that he had been requesting it since 2014. (ECF No. 129 at ¶¶100-102.) Adams emphasizes the doctor's order that he receive no soy, if possible. (*Id.* at ¶105.)

De Trana-Hinrichs next met with Adams on April 17, 2017. (ECF No. 93 at ¶112.) At that time, Adams was refusing to eat. (*Id.*) De Trana-Hinrichs updated his meal plan to reflect what food Adams said he would not eat. (*Id.* at ¶113.) Plain chicken breasts or thighs were ordered in place of lasagna, spaghetti, pizza, chicken, kielbasa, and Cajun chicken sausage. (*Id.*) Adams resumed eating the next day, although he asserts that he never received the diet that De Trana-Hinrichs ordered. (*Id.* at ¶114; ECF No. 129 at ¶112.)

## ANALYSIS

According to Adams, this case boils down to two simple issues: 1) defendants ignored his complaints of rectal bleeding and pain for well over a year before APNP Frank gave him a simple visual exam that confirmed he had a thrombosed hemorrhoid requiring surgery; and 2) defendants refused to give him the diet and bottled water they knew he needed because of his diseased liver.

Adams' claims arise under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, No. 18-2351, 2019 WL 2498640, at *3 (7th Cir. June 17, 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). The Court uses a two-part test to evaluate whether medical care amounts to cruel and unusual punishment; it asks 1) "whether a plaintiff suffered from an objectively serious medical condition" and 2) "whether the individual defendant was deliberately indifferent to that condition." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc)).

10

There is no dispute that Adams suffered from an objectively serious medical condition. He explains he endured severe pain and bleeding from his rectum for years, and his liver disease and IBS symptoms are well documented. His claims therefore turn on the subjective prong, *i.e.*, whether defendants responded with deliberate indifference to his conditions. The Court will evaluate each defendant's response to his conditions in turn.

### A. Treatment of Rectal Bleeding and Pain

Adams asserts that shortly after he arrived at Fox Lake in the fall of 2014, he began to complain about rectal bleeding and severe pain. He asserts that he filed hundreds of health services forms and repeatedly asked APNP Frank (his primary provider), Dr. Larson (who examined him occasionally), NP Trewyn (who was monitoring his HCV treatment), and Nurse Proehl to give him a rectal exam. (*See, e.g.*, ECF No. 131 at 4.) According to Adams, they refused to do so for more than a year. When APNP Frank finally gave him a rectal exam on February 9, 2016, he noted a large, partially prolapsed hemorrhoid, which required surgery. The surgery addressed Adams' bleeding and pain (until his hemorrhoids reoccurred).

Defendants do not explain why Adams was not given a rectal exam to check for hemorrhoids shortly after he began to complain about rectal bleeding and pain. Because Adams had a diseased liver and HCV, he was at risk of rectal varices, and it appears that defendants (APNP Frank in particular) assumed that the pain and bleeding were caused by varices. Defendants continued under that assumption even though Adams swears he begged repeatedly for a physical exam to check for hemorrhoids. Adams claims that despite his pleas, APNP Frank frequently told him to focus on his HCV treatment and address his IBS and the pain and bleeding would go away.

The Court of Appeals for the Seventh Circuit recently addressed similar facts, involving a prisoner/plaintiff, who, like Adams, claimed deliberate indifference based on a prison doctor's insistence on continuing an ineffective course of treatment while repeatedly disregarding the prisoner's complaints of ongoing unresolved pain. *See Goodloe v. Snood*, 947 F.3d 1026 (7th Cir. 2020). In *Goodloe*, a prisoner presented with pain from rectal bleeding and complained that he thought his hemorrhoids had flared up. The prison doctor refused to perform a rectal exam, even when the pain continued for months, instead proceeding with a series of ineffective treatments for anal warts. The doctor ignored the prisoner's continued reports that the treatments

11

were ineffective and denied requests for an examination or referral to a specialist. It was only after the prisoner had spent a year suffering severe pain and bleeding that the doctor finally listened and referred him to a colorectal specialist, who immediately diagnosed an anal fissure and arranged prompt treatment. Based on these facts, the Seventh Circuit concluded the prisoner had presented enough evidence to create jury issues on whether the doctor's persistence in an ineffective treatment and on whether his delay in referring the prisoner to an outside specialist amounted to deliberate indifference. *Id.* at 1031-32.

The Court is constrained by the holding in *Goodloe*, and under that case, Adams has presented enough evidence that, if believed, would allow a jury to conclude that APNP Frank was deliberately indifferent to his medical needs. According to Adams, APNP Frank was focused on treating Adams' HCV and IBS—he tried different treatments (diets, medications, fiber caps, consultations with offsite providers) but ignored Adams' repeated statements that the bleeding and pain was caused by something else. Adams states he begged for a rectal exam for more than a year, but APNP Frank ignored him or delayed giving him the exam and, when he finally performed the requested exam, APNP Frank immediately identified the source of Adams' issues: a thrombosed hemorrhoid requiring surgery. Based on these facts, a jury could conclude that APNP Frank's focus on treating the HCV and IBS as the source of the bleeding and pain and/or his delay in performing a rectal exam amounted to deliberate indifference. APNP Frank is not entitled to summary judgment.

Dr. Larson is a closer call, but the Court finds that Adams has shown enough of a dispute to put his claim to a jury. Adams asserts (and Dr. Larson does not dispute) that, in January 2015, he told Dr. Larson that he had been bleeding and in pain for many months. (ECF No. 138 at ¶15.) He asked Dr. Larson to do a rectal exam and told him that he had "been getting nowhere with Frank or Trew[y]n, and at the very least he could order somebody to do a visual rectal exam." (*Id.*) Dr. Larson declined, explaining that he had turned Adams' care over to APNP Frank. (*Id.*) Deferring care to a patient's primary provider may be acceptable in some circumstances; however, in this instance, Adams specifically informed Dr. Larson that his primary provider was refusing to provide him with a basic exam in response to his repeated complaints of severe rectal pain and bleeding. A reasonable jury could conclude that Dr. Larson's failure to follow up with APNP Frank and/or his refusal to perform a simple visual

12

exam despite knowing APNP Frank was not addressing Adams' needs amounted to deliberate indifference. Dr. Larson is not entitled to summary judgment.

Adams has not, however, presented evidence from which a reasonable jury could conclude that NP Trewyn was deliberately indifferent to his medical condition. NP Trewyn was tasked with monitoring Adams' HCV treatment. (ECF No. 93 at ¶28.) Adams explains that she examined him for that limited purpose shortly after he arrived at Fox Lake and then again about a month and a half later. After observing that Adams was not responding well to his treatment, she referred him to an outside specialist and ordered labwork for further evaluation. Adams says that at these examinations he told her about his rectal bleeding and pain, but she deferred treatment on those complaints to APNP Frank, explaining to Adams the limited purpose for which she was seeing him. (*Id.* at ¶¶28, 40.) Unlike Dr. Larson, who examined Adams for more general complaints after Adams had been unsuccessfully requesting for months that APNP Frank give him a rectal exam, NP Trewyn saw Adams early on in his treatment for a limited purpose. Given her limited involvement in Adams' care, how early in his care she interacted with him, and the complexity of the medical issues he faced, no jury could reasonably conclude that her decision to defer to the primary provider's treatment plan knowingly disregarded a substantial risk to Adams' health. *See, e.g., Rice ex rel. v. Correctional Medical Services*, 675 F.3d 650, 683 (7th Cir. 2012) (explaining that nurses may generally defer to a physician, although they may not ignore obvious risks to an inmate's health).

Nor could a jury conclude that Nurse Proehl was deliberately indifferent to Adams' medical needs. Defendants explain that Nurse Proehl did not perform a rectal exam in response to Adams' complaints because such exams are outside the scope of her duties. (ECF No. 93 at ¶47.) Although she did not perform a rectal exam, Nurse Proehl contacted Dr. Larson about Adams' complaints and scheduled an appointment with Dr. Larson so Adams could talk about his diet. (*Id.* at ¶¶44-46.) Adams complains that Nurse Proehl was rude and dismissive and accused him of lying and food seeking. While these behaviors are unpleasant and impolite, they do not violate the Constitution. The evidence shows that Nurse Proehl consistently performed her duties (taking vitals, recording complaints, etc.) and bubbled the concerns she could not address on her own to Adams' advanced care providers. No jury could conclude on this record that she was deliberately indifferent to his serious medical needs.

13

There also is insufficient evidence to suggest that Warden Hepp was deliberately indifferent to Adams' serious medical needs. As defendants explain, Hepp was not involved in determining Adams' medical care and treatment. Hepp's role was to make sure Adams was not being ignored; it was not to second-guess the health care providers' treatment decisions. *See Askew v. Davis*, 613 F. App'x 544, 548 (7th Cir. 2015) (holding that administrators are permitted to defer to medical providers' medical opinions). There is no dispute that Adams had a very complicated medical history, was regularly being seen by health services and offsite specialists, and was continually having his orders for medication and diet tweaked. No jury could reasonably conclude that Hepp was deliberately indifferent to Adams' condition because he did not override the medical staff's treatment decisions in favor of Adams' preferences.

### B. Diet and Bottled Water Claims

Adams claims that De Trana-Hinrichs and Whitman exacerbated his serious medical conditions by refusing to provide him with an adequate diet and clean water. Specifically, Adams asserts that De Trana-Hinrichs displayed deliberate indifference to his dietary needs by ordering foods that were toxic to him and that Whitman was deliberately indifferent to his liver disease when she refused to provide him with bottled water despite the water at Fox Lake containing dangerous levels of manganese, iron, and toxins.

With regard to his diet, Adams asserts that, from the day he arrived at Fox Lake, he requested a low-soy diet, per a doctor's order. Adams states that De Trana-Hinrichs acknowledged he needed the diet but refused to give it to him because she was afraid other inmates would demand the same diet.

De Trana-Hinrichs explains that she personally consulted with Adams on five occasions over the course of about a year and a half. As part of those consultations, she talked to Adams' health care providers, reviewed his weight and labs, listened to his dietary concerns, and reviewed his canteen purchases. *Every time* she met with Adams, she made changes to his dietary orders. She provided Adams with a high-calorie meal plan, extra snacks and drink supplements (Boost and, later, a calcium-fortified energy drink) to ensure he received adequate calories on those days he was unable to eat particular foods. She placed special orders for extra fruits and vegetables and eventually ordered plain chicken breasts and thighs in place of specific

14

foods Adams said he could not eat. Adams' weight, liver function labs, and protein levels were consistently within acceptable ranges.

No jury could conclude from De Trana-Hinrichs' many, many efforts that she was deliberately indifferent to his dietary needs. Adams asserts that food services failed to implement many of her orders and even gave him rotten fruits and vegetables out of spite, but De Trana-Hinrichs is not responsible for the bad acts of others. *See Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017). Adams also alleges that she and food services were acting together to deprive him of the foods he needed, but he offers no evidence from which a reasonable jury could conclude that was the case.

With regard to his insistence that De Trana-Hinrichs should have given him a low-soy diet per a doctor's order, Adams does not adequately support his contention that a low-soy diet was medically necessary. He points to a dietary order completed by an unknown person (the signature is unreadable). (ECF No. 133 at 560.) At the bottom of the form the comment, "No Soy – If Possible per MD" is typed. (*Id.*) This comment contains absolutely no context. It is not clear who wrote the order or why it was entered. None of Adams' providers at Fox Lake diagnosed Adams with a soy allergy or intolerance, and De Trana-Hinrichs, a trained dietician, decided there was no problem with Adams receiving soy, especially when he was being provided with additional food to give him the option of avoiding those foods he did not want to or could not eat. *See Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) (holding that differences of opinions between health care providers cannot support an inference of deliberate indifference). While Adams may have preferred a low-soy diet, the Constitution does not empower him to demand the diet of his choice. De Trana-Hinrichs is entitled to summary judgment on this claim.

With regard to his claim about bottled water, Whitman explains that, as of November 15, 2016, testing indicated that the tap water at Fox Lake was in compliance with standards. (ECF No. 93 at ¶137.) In addition, contrary to Adams' suggestion, the levels of manganese in the water were well below the warning level. (*Id.* at ¶147.) Whitman explains that, because the water can sometimes be tea colored, many inmates request bottled water. (*Id.* at ¶138.) However, no former or current inmate has ever been provided with bottled water. (*Id.* at ¶146.) This is because the water has been deemed safe for consumption and providing bottled water is not medically necessary. (*Id.* at ¶144.)

15

Adams disagrees with Whitman. He insists that the water is not safe, particularly not for people like him who have severe liver disease. However, Adams does not support his disagreements with evidence. He offers no evidence from which a reasonable jury could conclude the water was unsafe generally or that it was unsafe for him in particular. In fact, Adams explains that he raised his request for bottled water with Dr. Larson and APNP Frank, but they both denied his request. (ECF No. 129 at ¶145.) Whitman was entitled to rely on Adams' medical providers' judgment that Adams did not need bottled water, and she was not obligated to provide Adams with bottled water simply because he demanded it. Whitman is entitled to summary judgment.

## MOTION TO RESCIND CONSENT

This case was originally assigned to Chief Judge Pamela Pepper. On July 22, 2020, Adams consented to having a magistrate judge conduct all proceedings in this case. (ECF No. 143.) Defendants did not consent to magistrate judge jurisdiction, so the case was not reassigned to a magistrate judge. On September 21, 2020, the case was reassigned to a newly appointed district judge, after which Adams filed a motion to rescind his consent to magistrate judge jurisdiction. (ECF No. 144.) He explains he was very ill when he filed the consent and was not in his right mind, and therefore asks that Judge Pepper rule on this case. The Court will deny Adams' motion. The Court does not need the parties' consent to reassign a case to a different district judge, and Adams has no right to insist that any particular district judge rule on his case.

## CONCLUSION

The Court **GRANTS** defendants' motion for summary judgment (ECF No. 91) as to Randall Hepp, Samantha Floeter, Regina De Trana-Hinrichs, Jeff DeVries, Candace Whitman, Rebecca Trewyn, and Dawn Proehl, and **ORDERS** that those defendants are **DISMISSED**. The Court **DENIES** defendants' motion as to Robert Frank and Charles Larson.

The Court **DENIES** Adams' motion to rescind consent (ECF No. 144).

Dated at Milwaukee, Wisconsin this 15th day of October, 2020.

s/ Brett H. Ludwig

Brett H. Ludwig
United States District Judge